Eastern District of Kentucky
**F I L E D**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

FEB 0 6 2020

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**UNITED STATES OF AMERICA**

**V.**

**INDICTMENT NO.** 5:20-CR-24-KKC

**EARL LEE PLANCK, JR.,**
**R. CHAD PRICE, and**
**JESSE G. SMITH**

\* \* \* \* \*

**THE GRAND JURY CHARGES:**

## INTRODUCTION

1. **EARL LEE PLANCK, JR.**, **R. CHAD PRICE**, **and JESSE G. SMITH**, defendants herein, and others, worked together to defraud the United States through the filing of false insurance claims ultimately reimbursed by the United States Department of Agriculture ("USDA"), by making false statements and reports in connection with the federal crop insurance program.

2. The Defendants also worked together and with others to file false insurance claims on Crop Hail policies, ultimately paid for by private insurance companies, by making false statements on the private policy documentation.

### STATUTORY AND REGULATORY BACKGROUND

3. In 1938, Congress passed the Federal Crop Insurance Act ("Act"), 7 U.S.C.

§ 1501 *et seq.*, in order to promote the economic stability of agriculture in the United States through, in part, a system of crop insurance.

4.     In furtherance of this purpose, Congress established the Federal Crop Insurance Corporation ("FCIC"), which was authorized to insure crop losses due to drought, flood, or other natural disaster, as determined by the Secretary of the USDA. 7 U.S.C. §§ 1503 and 1508. Tobacco, wheat, corn, and soybeans were among the crops for which insurance was authorized under the Act. 7 U.S.C. § 1518.

5.     The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with a bona fide insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such naturally occurring events caused the harvest for the farm to be less than the amount specified in the insurance contract or written policy agreement, also known as the "guarantee." These federally-backed crop insurance policies are referred to as multi-peril crop insurance ("MPCI") policies.

6.     Farmers who opt to insure their crop are required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his or her yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his or her crop insurance policy, then the insurance premium is typically deducted from the amount paid out to the farmer under

2

the policy.

7.    Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold and the cause of loss.

8.    The insurance coverage, also called the guarantee, and premiums of coverage are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number ("FSN"). This means that the farmer's actual production history ("APH") determines the insurance policy's guarantee, based on how much of that crop the farmer has produced on that FSN during each of the four years immediately preceding the year for which insurance is sought. 7 U.S.C. § 1508. If a farmer has produced that crop for more than four years, the guarantee will be based upon that farmer's production history of those preceding years, but no more than ten years of production history will be used. 7 U.S.C. § 1508. A new producer is a person who has not actively engaged in farming of the crop sought to be insured in the county for more than two years. 7 C.F.R. § 400.52. New producers are given an estimated production yield based upon the county average production for the crop for the past 4 years. See 7 C.F.R. §§ 400.52(m), 400.52(p) and 400.55(b)(6).

9.    A farmer can elect to insure tobacco crop up to 75% of the APH guarantee. If a farmer elects 75% coverage on his tobacco crop, that farmer needs to sustain crop damage in excess of 25% to trigger a claim payment. A farmer can elect to insure corn

3

and soybean crops up to 85% of the APH guarantee and may elect revenue protection.

10.     The Risk Management Agency ("RMA") is an agency of the USDA that supervises the FCIC and administers all programs authorized under the Act. 7 U.S.C. § 6933.  Most crop insurance is sold by approved private insurance companies, called Approved Insurance Providers ("AIPs"), through an insurance agent working on behalf of the AIP.  AIPs are reinsured by the FCIC/RMA under provisions established in a Standard Reinsurance Agreement ("SRA"), a contract between the AIPs and RMA. The FCIC/RMA also pays, or subsidizes, a portion of the premium paid by the farmer.

11.     The insurance agent obtains basic information from the producer pertaining to the crop to be insured. This information is reported on forms the producer sends to his or her agent. The producer and agent acknowledge on these forms that failure to report completely and accurately may void the applicant's crop insurance policy and may result in criminal or civil false claims actions. The crop insurance agent forwards this information through the insurance company to FCIC/RMA. This information, including the Production Worksheet, is used to calculate the premium to be paid by the producer for the insurance, and is also used to calculate the indemnity in the event of a loss claim.

12.     Producers often elect to take their crop to harvest even after the crop has sustained damage.  A Production Worksheet is used to record the amount of harvested production to include crop sales, quality assessments, and harvest appraisals, among other things, to ascertain the production to count, or actual yield, used in determining the indemnity due. The producer certifies on this report that failure to report completely and

4

accurately may result in the voiding of the applicant's crop insurance contract and may result in criminal or civil false claims actions.

13.     The FCIC tobacco crop provisions provide for quality loss adjustment should the burley tobacco crop sustain damage reducing the quality of the crop. RMA's procedures for burley tobacco rely on grades assigned by Agriculture Marketing Service ("AMS") graders using USDA Official Standard Grades. The lowest grade quality is a No Grade ("NOG"). A loss that reduces the quality, or grade, of the tobacco can result in an increased indemnity.

14.     According to RMA established procedures, if the producer believes he or she has a potential loss of quality, he or she must determine which bales of tobacco need to be graded. The Tobacco Administration Grading Service ("TAGS") was established to facilitate the grading process and provide scheduling services via telephone or a website. A producer with a potential loss of quality can schedule an inspection with the AMS grader by contacting TAGS. The producer may ask his or her crop insurance agent for assistance in scheduling an inspection. The producer is charged a fee for the grading process. The producer receives a unique Grading Confirmation Number ("GCN") intended to track the bales graded. AMS electronically transmits the GCN information to RMA. Tobacco bales designated as NOG receive the highest discount factor resulting in a higher amount of loss, and thus, higher indemnities. The grade, weights, and other relevant information is transmitted to the appropriate insurance company to complete the claim.

15.     When a loss is paid on a crop insurance policy, the loss is calculated by the AIP and paid to the producer, often through the agent. Pursuant to the SRA, the AIP is reimbursed by the FCIC/RMA.

16.     Insured producers are required to retain documentation related to their crop from planting through the disposition of their crop, including receipts for seed and other expenditures. They may be required to turn this documentation over to their agent or AIP to justify claims of loss or other inquiries.

17.     In addition to federal insurance coverage, a farmer may also elect to obtain private insurance coverage. The private market offers insurance coverage directly to the producer to cover specific perils, such as hail, wind, and fire. State insurance departments regulate private crop insurance; FCIC does not reinsure or regulate private insurance.

18.     Private crop hail policies provide additional coverage and protection for the erratic damage hail can cause to a crop. The advantages of a private crop hail policy are the availability to purchase from several private insurers for a variety of crops, claims are often paid following the damage assessment (i.e., even paid before harvest), and insurance may be purchased at any time during the growing season. Private crop hail insurance providers establish limits to the amount of dollar coverage for crops and premium rates.

19.     Private crop hail insurance is popular in areas prone to hail events during the growing season. The producer may use private hail crop insurance as a tool to reduce the risk between the value of their crop and coverage available with the MPCI policy. The difference between the actual production and the coverage level is often referred to as the

6

"gap" in coverage or a deductible. For example, if tobacco is insured at 75% (the maximum allowed by the MPCI policy) of the production guarantee, the gap coverage is 25%. The producer may use private hail crop insurance as a tool to reduce the risk between the value of their crop and coverage available with the FCIC.

20.     AIPs often offer combination policies to their customers, whereby producers can obtain a combination MPCI and private insurance coverage for their crop. In this scenario, the federal government continues to reinsure the MPCI indemnities, while the private company backs the private policy.

## FACTUAL BACKGROUND

21.     At all times relevant hereto, **EARL LEE PLANCK, JR**. owned and rented farmland in Bath, Bourbon, Clark, Fleming, Montgomery, and Nicholas Counties, all located within the Eastern District of Kentucky. **PLANCK** produced, among other crops, tobacco, corn, and soybeans, which he began to insure through federal crop insurance in or around 1999. He and family members operated B.S. Land and Cattle Company, LLC, a farming enterprise, until approximately April 2014, at which time **PLANCK** became the sole owner of the company. T.L.L. and D.L. are related to **PLANCK**. B.J.P. and K.C. are friends of **PLANCK's**, both of whom were tobacco producers in the area at the times relevant to the Indictment.

22.     At all times relevant hereto, **R. CHAD PRICE** rented farmland in Bath, Bourbon, Fleming, Mason, Montgomery, and Nicholas Counties, all located within the Eastern District of Kentucky. **PRICE** produced, among other crops, tobacco, corn, and

7

soybeans, which he began to insure through federal crop insurance in or around 2008. A.B.W. was **PRICE's** friend and leased land to **PRICE.**

23.     At all times relevant hereto, **JESSE G. SMITH** claimed on insurance documents to produce tobacco on farms in Bath, Bourbon, Fleming, Montgomery, and Nicholas Counties, all located within the Eastern District of Kentucky.  He insured these crops through MPCI policies from 2009 until 2012.

## COUNT 1
### 18 U.S.C. § 371
### *Conspiracy to Defraud the United States*

24.     Paragraphs 1 through 23 above are re-alleged and incorporated herein by reference.

## CONSPIRACY

25.     In or about March 2010 and continuing thereafter until in or about December 2015, in Bath, Bourbon, Clark, Fleming, Mason, Montgomery, and Nicholas, Counties, all located within the Eastern District of Kentucky and elsewhere,

### EARL LEE PLANCK, JR.

knowingly and willfully conspired and agreed with T.L.L., D.L., and others known and unknown to the Grand Jury, to commit an offense against the United States, that is, making false statements and reports for the purpose of influencing in any way the actions of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

8

## PURPOSE OF THE CONSPIRACY

26.     It was the purpose of the conspiracy to profit from the FCIC by making material misrepresentations on MPCI application forms and documentation supporting claims of losses.

## MANNER AND MEANS

27.     The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

a. **PLANCK** agreed with others, including T.L.L. and D.L., to obtain MPCI policies in the names of T.L.L. and D.L., by falsifying insurance documentation to make it appear as though these individuals were 100% insurable interest owners of certain farms and crops, when those farms and crop belonged to **PLANCK**. In this way, **PLANCK** could spread the indemnity payments for claims of loss among numerous people to avoid further scrutiny from insurance companies and the USDA, and may have obtained more favorable guarantees on policies covering his farm and crop.

b. **PLANCK** agreed with other producers to alternate farms on their MPCI policies over the years. In this way, **PLANCK** could avoid oversight and further scrutiny by the insurance companies and the USDA.

c. **PLANCK** agreed with insurance agents and adjusters to insure farms that were incapable of growing crop, on occasion insuring the untillable land in the names of T.L.L. and D.L., among others.

9

## OVERT ACTS

28.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Kentucky and elsewhere:

   a. On or about November 5, 2015, **PLANCK** or his co-conspirators forged the signature of T.L.L. on a Production Worksheet on Policy #836868, for Crop Year 2015. On the same policy for Crop Year 2015, **PLANCK** or his co-conspirators forged the signature of T.L.L. on her Notice of Loss on or about August 26, 2015.

   b. In Crop Year 2007, **PLANCK** insured Farm Serial Number 4489, then Farm Serial Number 3751, Tract 10113, Field 1, in the name of D.L. This was a wooded lot. In Crop Years 2010, 2011, and 2013, **PLANCK** obtained insurance on this same farm, then Farm Serial Number 4489, in his own name. In Crop year 2012, **PLANCK** insured the same farm in the name of T.L.L.

   c. On or about April 6, 2015, two checks from ARMtech Insurance Services totaling $287,627 and payable to T.L.L. were deposited into Citizens Bank account ending in x0728, an account in the name of **PLANCK** and T.L.L. Also on or about April 6, 2015, a counter check was written from Citizens Bank account ending in x0728 payable to Farm Credit Mid-America. This check was presented to Farm Credit Mid-America and applied in part to

10

loans, a line of credit, and an AgriBank money market account, all in the

name of **PLANCK**.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
## 18 U.S.C. § 371
### *Conspiracy to Defraud the United States*

29.    Paragraphs 1 through 23 above are re-alleged and incorporated herein by

reference.

## CONSPIRACY

30.    In or about March 2010 and continuing thereafter until on or about

December 2015, in Bath, Bourbon, Clark, Fleming, Mason, Montgomery, and Nicholas,

Counties, all located within the Eastern District of Kentucky, and elsewhere,

## R. CHAD PRICE

knowingly and willfully conspired and agreed with A.B.W., and others known and

unknown to the Grand Jury, to commit an offense against the United States, that is,

making false statements and reports for the purpose of influencing in any way the actions

of the FCIC, and companies the FCIC reinsures, upon an application, advance,

commitment, loan, and insurance agreement or application for insurance or a guarantee,

in violation of 18 U.S.C. § 1014.

## PURPOSE OF THE CONSPIRACY

31.    It was the purpose of the conspiracy to profit from the FCIC by making

material misrepresentations on MPCI application forms and documentation supporting

11

claims of losses.

## MANNER AND MEANS

32.     The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

    a.  **PRICE** agreed with others, including A.B.W., to obtain MPCI policies in A.B.W.'s name, by falsifying insurance documentation to make it appear as though A.B.W. was the 100% insurable interest owners of certain farms and crops, when those farms and crop belonged to **PRICE**.

    b.  In this way, **PRICE** could spread the indemnity payments for claims of loss among numerous people to avoid further scrutiny from insurance companies and the USDA, and may have obtained more favorable guarantees on policies covering his farm and crop.

## OVERT ACTS

33.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Kentucky and elsewhere:

    a.  On or about July 15, 2014, **PRICE** or his co-conspirators forged the signature of A.B.W. on his Acreage Report for Crop Year 2014 (Policy #834316).

12

b. On or about July 15, 2015, **PRICE** or his co-conspirators forged the

signature of A.B.W. on an Acreage Report on a policy issued in A.B.W.'s

name (Policy #834316).

c. On or about April 9, 2015, a check from ARMtech Insurance Services

totaling $168,004 and payable to A.B.W. was applied to an AgriBank

money market account in the name of A.B.W. An internal transfer

occurred in which $148,000 was transferred from A.B.W.'s AgriBank

money market account and applied to a Farm Credit Mid-America Line of

Credit in the name of **PRICE**, to be effective May 12, 2015.

All in violation of Title 18, United States Code, Section 371.

## COUNT 3
### 18 U.S.C. § 371
### *Conspiracy to Defraud the United States*

34. Paragraphs 1 through 23 above are re-alleged and incorporated herein by reference.

## CONSPIRACY

35. On or about September 2013, and continuing thereafter until on or about

December 2015, in Bath, Bourbon, Clark, Fleming, Mason, Montgomery, and Nicholas

Counties, all located within the Eastern District of Kentucky and elsewhere,

**EARL LEE PLANCK, JR. and**
**R. CHAD PRICE**

knowingly and willfully conspired and agreed together and with each other and others

known and unknown to the Grand Jury, to commit an offense against the United States,

that is, making false statements and reports for the purpose of influencing in any way the

actions of the FCIC, and companies the FCIC reinsures, upon an application, advance,

commitment, loan, and insurance agreement or application for insurance or a guarantee,

in violation of 18 U.S.C. § 1014.

## PURPOSE OF THE CONSPIRACY

36.     It was the purpose of the conspiracy to profit from the FCIC by making

material misrepresentations on MPCI application forms and documentation supporting

claims of losses.

## MANNER AND MEANS

37.     The manner and means used to accomplish the objectives of the conspiracy

included, among others, the following:

      a.  **PLANCK** and **PRICE** agreed with each other and others, including B.J.P.

          and K.C. to sell good tobacco produced on their farms to tobacco

          companies.  **PLANCK**, **PRICE**, and the other farmers, including B.J.P.

          and K.C., then wrote checks to Clay's Tobacco Warehouse for the same

          amount as the sale.

      b.  **PLANCK**, in agreement with Clay's Tobacco Warehouse employees,

          obtained false paperwork that made it seem like the farmers purchased

tobacco from Clay's Tobacco Warehouse to sell to the tobacco company.

c. **PLANCK**, working in conjunction with Clay's Tobacco Warehouse employees, obtained false documentation of "no-grade tobacco" grades for tobacco graded in the name of **PLANCK**, **PRICE**, B.J.P., K.C., and others.

d. **PLANCK**, **PRICE**, B.J.P., K.C., and others then materially misrepresented the amount and quality of tobacco they produced on their farms on claims of loss documentation.

e. B.J.P., K.C., and others paid **PLANCK** for his assistance.

## OVERT ACTS

38.    In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Kentucky and elsewhere:

a.    **PLANCK** and his co-conspirators generated and provided **PRICE** Clay's Tobacco Warehouse Sales Bills dated January 7, 2015, January 14, 2015, and February 25, 2015 indicating he sold 14,015 pounds of tobacco, but all the proceeds of the sale were "Applied to Advances." Tobacco that did not belong to **PRICE** was presented at Clay's Tobacco Warehouse for grading under **PRICE's** name, generating a corresponding false grade report. The grade reports and corresponding sales bills were then submitted with **PRICE's** insurance claim of loss for Crop Year 2014.

b. **PLANCK** and his co-conspirators generated and provided K.C. a Clay's Tobacco Warehouse Sales Bill dated December 10, 2014, indicating that he sold 17,487 pounds of tobacco, but all the proceeds of the sale were "Applied to Advances." Tobacco that did not belong to K.C. was presented at Clay's Tobacco Warehouse for grading under K.C.'s name, generating a corresponding false grade report. The grade reports and corresponding sale bills were then submitted with K.C.'s insurance claim of loss for Crop Year 2014.

c. **PLANCK** and his co-conspirators generated and provided A.B.W. a Clay's Tobacco Warehouse Sales Bills dated December 17, 2014, and January 7, 2015, indicating that he sold 12,249 pounds of tobacco, but all the proceeds of the sale were "Applied to Advances." Tobacco that did not belong to A.B.W. was presented at Clay's Tobacco Warehouse for grading under A.B.W.'s name, generating a corresponding false grade report. The grade reports and corresponding sale bills were then submitted with A.B.W.'s insurance claim of loss for Crop Year 2014.

d. **PLANCK** and his co-conspirators generated and provided B.J.P. a Clay's Tobacco Warehouse Sales Bill dated January 14, 2015, and January 28, 2015, indicating that he sold 23,052 pounds of tobacco, but all the proceeds of the sale were "Applied to Advances." Tobacco that did not belong to B.J.P. was presented at Clay's Tobacco Warehouse for grading under

16

B.J.P.'s name, generating a corresponding false grade report. The grade

reports and corresponding sale bills were then submitted with B.J.P.'s

insurance claim of loss for Crop Year 2014.

e. **PLANCK** and his co-conspirators generated and provided **PLANCK** a

Clay's Tobacco Warehouse Sales Bill dated December 17, 2014, indicating

that he sold 16,992 pounds of tobacco, but all the proceeds of the sale were

"Applied to Advances." Tobacco that did not belong to **PLANCK** was

presented at Clay's Tobacco Warehouse for grading under **PLANCK's**

name, generating a corresponding false grade report. The grade reports and

corresponding sale bills were then submitted with **PLANCK's** insurance

claim of loss for Crop Year 2014.

All in violation of Title 18, United States Code, Section 371.

**COUNTS 4 - 12**
**18 U.S.C. § 1014**
**18 U.S.C. § 2**

39.     Paragraphs 1 through 23 above are re-alleged and incorporated herein by

reference.

40.     On or about the dates listed below, in Bath, Bourbon, Clark, Fleming,

Mason, Montgomery, and Nicholas Counties, all located within the Eastern District of

Kentucky, and elsewhere,

**EARL LEE PLANCK, JR.,**

aided and abetted by others, and aiding and abetting others, knowingly made false

17

statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | Description |
|-------|------|-------------|
| 4 | February 18, 2011 | Production Worksheets indicating that **EARL LEE PLANCK, JR.** produced 7,660 pounds of tobacco in Crop Year 2010, when he then and there knew he had additional production of crop in that year he failed to report. |
| 5 | February 18, 2011 | Production Worksheet indicating that **EARL LEE PLANCK, JR.** planted crop in Farm Serial Number 4489, and Farm Service Agency 578 reporting Farm 4489, Tract 10113, Field 1, in Crop Year 2010, when he then and there knew this was a wooded lot, incapable of being farmed. |
| 6 | February 6, 2012 | Production Worksheets indicating that **EARL LEE PLANCK, JR.** produced 6,593 pounds of tobacco in Crop Year 2011, when he then and there knew he had additional production of crop in that year he failed to report. |
| 7 | September 12, 2011; December 12, 2011; and January 12, 2012 | Production Worksheet indicating that **EARL LEE PLANCK, JR.** planted crop in Farm Serial Number 4489, and Farm Service Agency 578 reporting Farm 4489, Tract 10113, Field 1, in Crop Year 2011, when he then and there knew this was a wooded lot, incapable of being farmed. |
| 8 | February 23, 2013 | Production Worksheets indicating that **EARL LEE PLANCK, JR.** produced 15,144 pounds of tobacco in Crop Year 2012, when he then and there knew he had additional production of crop in that year. |
| 9 | January 30, 2014 | Production Worksheets indicating that **EARL LEE PLANCK, JR.** produced 21,975 pounds of tobacco in Crop Year 2013, when he then and there knew he had additional production of crop in that year he failed to report. |
| 10 | March 1, 2014 | Production Worksheet indicating that **EARL LEE PLANCK, JR.** planted crop in Farm Serial Number 4489, and Farm Service Agency 578 reporting Farm 4489, Tract 10113, Field 1, in Crop Year 2013, when |

| | | he then and there knew this was a wooded lot, incapable of being farmed. |
|---|---|---|
| 11 | February 23, 2015 | Production Worksheets indicating that **EARL LEE PLANCK, JR.** produced 16,992 pounds of tobacco in Crop Year 2014, when he then and there knew he had additional production of crop in that year he failed to report. |
| 12 | March 11, 2016; March 24, 2016 | Production Worksheets indicating that **EARL LEE PLANCK, JR.** produced 48,141 pounds of tobacco in Crop Year 2015, when he then and there knew he had additional production of crop in that year he failed to report. |

All in violation of Title 18, United States Code, Section 1014.

### COUNTS 13 - 17
### 18 U.S.C. § 1014
### 18  U.S.C. § 2

41.    Paragraphs 1 through 23 above are re-alleged and incorporated herein by reference.

42.    On or about the dates listed below, in Bath, Bourbon, Fleming, Mason, Montgomery, and Nicholas Counties, all located within the Eastern District of Kentucky, and elsewhere,

### R. CHAD PRICE,

aided and abetted by others, and aiding and abetting others, knowingly made false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | Description |
|-------|------|-------------|
| 13 | February 6, 2012 and March 2, 2012 | Production Worksheets indicating that **R. CHAD PRICE** produced 11,020 pounds of tobacco in Crop Year 2011, when he then and there knew he had additional production of crop in that year he failed to report. |
| 14 | March 21, 2013 | Production Worksheets indicating that **R. CHAD PRICE** produced 22,137 pounds of tobacco in Crop Year 2012, when he then and there knew he had additional production of crop in that year. |
| 15 | April 20, 2014 | Production Worksheets indicating that **R. CHAD PRICE** produced 11,908 pounds of tobacco in Crop Year 2013, when he then and there knew he had additional production of crop in that year he failed to report. |
| 16 | July 15, 2014 | Crop Year 2014 MPCI Acreage Report for insurance policy in the name of A.B.W., with his signature forged, claiming that A.B.W. was the 100% insurable interest owner in farm and crop actually owned by **R. CHAD PRICE**. |
| 17 | March 25, 2015 | Production Worksheets indicating that **R. CHAD PRICE** produced 14,015 pounds of tobacco in Crop Year 2014, when he then and there knew he had additional production of crop in that year he failed to report. |

All in violation of Title 18, United States Code, Section 1014.

## COUNTS 18 - 20
## 18 U.S.C. § 1014
## 19 U.S.C. § 2

43.    Paragraphs 1 through 23 above are re-alleged and incorporated herein by reference.

44.    On or about the dates listed below, in Bath, Bourbon, Fleming, Montgomery, and Nicholas Counties, all located within the Eastern District of Kentucky, and elsewhere,

20

### JESSE G. SMITH,

aided and abetted by others, and aiding and abetting others, knowingly made false

statements and reports for the purpose of influencing in any way the action of the FCIC,

and companies the FCIC reinsures, upon an application, advance, commitment, loan, and

insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | Description |
|---|---|---|
| 18 | March 4, 2011 | Crop Year 2010 documentation certifying that **JESSE G. SMITH** was the 100% insurable interest owner in crop on Farm Serial Numbers 726 and 1617, when **SMITH** knew he was not the 100% insurable interest owner of this crop. |
| 19 | August 20, 2011, August 27, 2011, and January 9, 2012 | Crop Year 2011 documentation certifying that **JESSE G. SMITH** was the 100% insurable interest owner in crop on Farm Serial Numbers 4003, when **SMITH** knew he was not the 100% insurable interest owner of this crop. |
| 20 | January 17, 2013 | Crop Year 2012 documentation certifying that **JESSE G. SMITH** was the 100% insurable interest owner in crop on Farm Serial Numbers 3122, 2041, 4001, 3885, when **SMITH** knew he was not the 100% insurable interest owner of this crop. |

All in violation of Title 18, United States Code, Section 1014.

### COUNT 21
### 18 U.S.C. § 1349
### *Conspiracy to Commit Mail and Wire Fraud*

45.     Paragraphs 1 through 23 above are re-alleged and incorporated herein by

reference.

46.     From in or about May 2013, and continuing through in or about December

2015, in Bath, Bourbon, Fleming, Mason, Montgomery, and Nicholas Counties, all

located within the Eastern District of Kentucky, and elsewhere,

21

**EARL LEE PLANCK, JR.,**
**R. CHAD PRICE,**

and others, knowingly and intentionally conspired with each other and with others to

commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

## PURPOSE OF THE CONSPIRACY

47.    It was the purpose of the conspiracy to profit through the filing of false and

fictitious insurance claims.

## MANNER AND MEANS

48.    It was part of the conspiracy that in Crop Year 2013, **PLANCK** caused

private crop insurance policies to be issued in the name of T.L.L. and D.L., claiming that

T.L.L. and D.L. had a 100% insurable interest in crop for which **PLANCK** owned or

rented the land and paid the inputs. The private crop insurance company was induced to

insure the crop in the names of T.L.L. and D.L., not knowing that this policy was actually

for **PLANCK's** benefit. **PLANCK** caused the application documents to be submitted

through his insurance agent via mail or electronic wires.

49.    In Crop Years 2014 and 2015, it was part of the conspiracy that **PLANCK**

caused private crop insurance policies to be issued in the name of T.L.L., claiming that

T.L.L. had a 100% insurable interest in crop for which **PLANCK** owned or rented the

land and paid the inputs. The private crop insurance company was induced to insure the

crop in the name of T.L.L., not knowing that these policies were actually for **PLANCK's**

benefit. **PLANCK** caused the application documents to be submitted through his

22

insurance agent via mail or electronic wires.

50.     In Crop Years 2013 and 2014, **PRICE** caused private crop insurance policies to be issued in the name of A.B.W., claiming that A.B.W. had a 100% insurable interest in crop for which **PRICE** owned or rented the land and paid the inputs. The private crop insurance company was induced to insure the crop in the name of A.B.W., not knowing that this policy was actually for **PRICE's** benefit. **PRICE** caused the application documents to be submitted through his insurance agent via mail or electronic wires.

51.     **PLANCK** and **PRICE**, with the assistance of their crop insurance agent and crop insurance adjusters, caused false documentation to support a damage claim to the crop in the names of **PLANCK**, **PRICE**, T.L.L., and D.L. to be generated and submitted to the insurance company through the mail or interstate wire communication. For example:

a. In Crop Year 2013, test sheets submitted in **PRICE's** Crop-Hail claim of loss (Policy 44018) exactly matched the test sheet submitted on T.L.F.'s claim of loss (Policy 44023), a nominee policy issued to cover PLANCK's farm and crop. Also, a test sheet submitted on **PLANCK's** Crop-Hail claim of loss (Policy 44020) exactly matched the test sheet submitted on T.L.F.'s claim of loss on the Crop-Hail policy in her name (Policy 44023). Another test sheet submitted on **PRICE's** Crop Hail claim of loss (Policy 44018) exactly matched the test sheet submitted on **PLANCK's** claim of loss on

23

his Crop-Hail policy (44020).

    b. In Crop Year 2014, photographs of damage submitted on the Crop-Hail claim of loss on a policy in A.B.W.'s name (Policy 834316) for the benefit of **PRICE** were also submitted on the Crop-Hail claim of loss on a policy in another producer's name (Policy 834531). That same year, photographs of damage submitted on the Crop-Hail claim of loss on a policy in the name of B&S Land and Cattle for the benefit of **PLANCK** (Policy 44021) were also submitted on a claim of loss on a policy in **PLANCK's** name (Policy 47018).

52.    It was further part of the scheme that T.L.L. and D.L. caused Form 1099s to be issued to **PLANCK** for their crop insurance proceeds, which **PLANCK** filed to support his income on his tax returns as late as October 2016.

53.    It was further part of the scheme that **PLANCK** and **PRICE** caused the insurance company, ARMtech Insurance Services, to issue to **PLANCK**, **PRICE**, T.L.L. and D.L. insurance indemnity payments based on the claims of loss that contained material misrepresentations, which payments were either sent in the form of a check through the mail or deposited electronically into a bank account using interstate wire communication.

All in violation of 18 U.S.C. § 1349.

24

## COUNT 22
### 18 U.S.C. § 1956(h)
### *Conspiracy to Commit Money Laundering*

54.     Paragraphs 1 through 53 above are re-alleged and incorporated herein by reference.

55.     From in or about November 2013 and continuing through in or about March 2015, in Bath, Bourbon, Fleming, Mason, Montgomery, and Nicholas counties, all located within the Eastern District of Kentucky, and elsewhere,

### EARL LEE PLANCK, JR. and
### R. CHAD PRICE

did knowingly combine, conspire, and agree with each other and with other persons, known and unknown to the Grand Jury, to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, to wit:

(a) knowingly conducting and attempting to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, 18 U.S.C. §§ 371, 1014, and 1349, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

25

(b) knowingly engaging and attempting to engage in monetary transactions by,
through, or to a financial institution, affecting interstate commerce, in
criminally derived property of a value greater than $10,000, such property
having been derived from a specified unlawful activity, that is, 18 U.S.C.
§§ 371, 1014, and 1349, in violation of 18 U.S.C. § 1957.

### Manner and Means

56.     The manner and means used to accomplish the objectives of the conspiracy
included, among others, the following:

a.  **PLANCK** and **PRICE** wrote checks to Clay's Tobacco Warehouse for the
same amount as the money they received for their sales of tobacco that they
failed to report in their MPCI claims of loss.

b.  R.W. deposited those checks into the Clay's Tobacco Warehouse account,
and then wrote checks from Clay's Tobacco Warehouse to Farm Credit
Mid-America, less approximately $11,000 that he retained in the
warehouse's bank account.  **PLANCK** then deposited the checks to Farm
Credit Mid-America accounts in the name of **PLANCK**, **PRICE**, and
others.

c.  On occasion, **PLANCK** requested that Farm Credit Mid-America issue
new checks in the names of others, including K.C., B.J.P., B.P., and J.D.P.,
for approximately 70% of the value of the check from Clay's Tobacco
Warehouse.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 23 - 25
## 26 U.S.C. § 7201
### *Tax Evasion*

On or about each of the years listed below, in Nicholas County, in the Eastern

District of Kentucky,

### EARL LEE PLANCK, JR.,

a resident of Carlisle, Kentucky, willfully attempted to evade and defeat income tax due

and owing by him and his spouse to the United States of America, for the calendar years

set forth below, by preparing and causing to be prepared, and by signing and causing to

be signed, false and fraudulent tax returns, Form 1040, which was submitted to the

Internal Revenue Service. On these tax returns, **PLANCK** reported and caused to be

reported that his and his spouse's joint taxable income for the calendar years mentioned

below was in the amount listed below, and that the amount of tax due and owing was in

the amount listed below. In fact, as **PLANCK** knew, **PLANCK** and his spouse had joint

taxable income that was substantially greater for each calendar year mentioned below,

and as a result of such additional taxable income, there was additional tax due and owing

to the United States of America.

| Count | Calendar Year | Taxable Income Reported | Due And Owing Reported |
|-------|---------------|-------------------------|------------------------|
| 23 | 2013 | ($23,614) | $0 |
| 24 | 2014 | ($173,588) | $0 |
| 25 | 2015 | ($23,728) | $0 |

In violation of Title 26, United States Code, Section 7201.

### COUNTS 26 - 28
### 26 U.S.C. § 7201
### *Tax Evasion*

On or about each of the years listed below, in Nicholas County, in the Eastern District of Kentucky,

### R. CHAD PRICE,

a resident of Carlisle, Kentucky, willfully attempted to evade and defeat income tax due and owing by him and his spouse to the United States of America, for the calendar years set forth below, by preparing and causing to be prepared, and by signing and causing to be signed, false and fraudulent tax returns, Form 1040, which was submitted to the Internal Revenue Service. On these tax returns, **PRICE** reported and caused to be reported that his and his spouse's joint taxable income for the calendar years mentioned below was in the amount listed below, and that the amount of tax due and owing was in the amount listed below. In fact, as **PRICE** knew, **PRICE** and his spouse had joint taxable income that was substantially greater for each calendar year mentioned below, and as a result of such additional taxable income, there was additional tax due and owing to the United States of America.

| Count | Calendar Year | Taxable Income Reported | Due And Owing Reported |
|-------|---------------|-------------------------|------------------------|
| 26 | 2013 | ($10,660) | $0 |
| 27 | 2014 | $3,564 | $0 |
| 28 | 2015 | $1,922 | $0 |

In violation of Title 26, United States Code, Section 7201.

## FORFEITURE ALLEGATIONS
**18 U.S.C. § 981(a)(1)(C)**
**18 U.S.C. § 982(a)(1)**
**28 U.S.C. § 2461**

1.      The allegations contained in Counts 1-22 of this Indictment are hereby realleged and incorporated by reference for the purpose of proposing the forfeiture allegations pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461(c).

2.      Upon conviction of the offense in Count 22 of this Indictment, **EARL LEE PLANCK, JR.,** and **R. CHAD PRICE** shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to the below listed property.

3.      Upon conviction of the offenses in Counts 1, 3-12, 21, and 22 of this Indictment, **EARL LEE PLANCK, JR.,** shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(l)(C) and 982(a)(1) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses, including but not limited to the below listed property.

4.      Upon conviction of the offenses in Counts 2, 3, 13-17, 21, and 22 of this Indictment, **R. CHAD PRICE,** shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(l)(C) and 982(a)(1) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses, including but not limited to the below listed property.

29

5.    Property sought for forfeiture includes, but is not limited to:

**REAL PROPERTY**:

A) 48.95 ACRES ON DIXIE HWY., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR., PVA MAP # 056-00-00-024.00 AND RECORDED IN DEED BOOK 117, PAGE 185, NICHOLAS COUNTY CLERK'S OFFICE;

B) 222 ACRES WITH MOBILE HOME ON DIXIE HWY. AND MAPLE GROVE, CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR. AND SUZANNA PLANCK, PVA MAP # 052-00-00-040.00 AND RECORDED IN DEED BOOK 125, PAGE 160, NICHOLAS COUNTY CLERK'S OFFICE;

C) 36 ACRES WITH MOBILE HOME AT 1358 DIXIE HWY., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR. AND SUZANNA PLANCK, PVA MAP # 052-00-00-042.00 AND RECORDED IN DEED BOOK 125, PAGE 4, NICHOLAS COUNTY CLERK'S OFFICE ;

D) 1.679 ACRES WITH HOUSE, POOL, SHED AT 1834 DIXIE HWY., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR. AND SUZANNA PLANCK, PVA MAP # 057-00-00-007.03 AND RECORDED IN DEED BOOK 117, PAGE 25, NICHOLAS COUNTY CLERK'S OFFICE;

E) 193.3 ACRES ON DIXIE HWY., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF PLANK TRUST, ET AL., PVA MAP # 057-00-00-007.00 AND RECORDED IN DEED BOOK 108, PAGE 73, NICHOLAS COUNTY CLERK'S OFFICE;

F) 74 ACRES WITH HOUSE ON MAPLE GROVE RD., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN NAME OF EARL LEE PLANK, JR. AND

SUZANNA PLANK, PVA MAP # 056-00-00-035.00 AND RECORDED IN DDED BOOK 125, PAGE 151, NICHOLAS COUNTY CLERK'S OFFICE;

G) 201 ACRES ON GRAVEL ROAD, CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR. AND SUZANNA PLANCK, PVA MAP # 040-00-00-006.00 AND 171.99 ACRES WITH TWO HOUSES, BARN, AND MOBILE HOME AT 3700 & 3653 EAST UNION RD., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR AND SUZANNA PLANCK, PVA MAP # 040-00-00-010.00 AND BOTH PARCELS BEING RECORDED IN DEED BOOK 128, PAGE 616, AND IN DEED OF CORRECTION RECORDED IN DEED BOOK 128, PAGE 790, NICHOLAS COUNTY CLERK'S OFFICE;

H) 127.5 ACRES ON LOWER SHARPSBURG RD., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR. AND SUZANNA PLANCK, PVA MAP # 041-00-00-025.00 AND RECORDED IN DEED BOOK 119, PAGE 238, NICHOLAS COUNTY CLERK'S OFFICE;

I) 46 ACRES ON LOWER SHARPSBURG RD., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR. AND SUZANNA PLANCK, PVA MAP # 041-00-00-028.00 AND RECORDED IN DEED BOOK 119, PAGE 702, NICHOLAS COUNTY CLERK'S OFFICE;

J) 127 ACRES WITH HOUSE AND SHOP AT 250 DIXIE HWY., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR. AND SUZANNA PLANCK, PVA MAP # 053-00-00-031.00 AND RECORDED IN DEED BOOK 73, PAGE 184, NICHOLAS COUNTY CLERK'S OFFICE; K) 125 ACRES ON CONVICT RD., CARLISLE, NICHOLAS COUNTY, KENTUCKY, WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, IN THE NAME OF EARL LEE PLANCK, JR. AND SUZANNA PLANCK, PVA MAP  #041-00-00-029.00 AND RECORDED IN DEED BOOK 86, PAGE 441, NICHOLAS COUNTY CLERK'S OFFICE.

## CURRENCY/FINANCIAL ACCOUNTS:

A) $350,012.94 in U.S. currency Seized on December 9, 2015, from Farm Cash Management Account #XXXXXX1400, held at AgriBank, in the name of B.S. Land and Cattle;

B) $139,176.55 in U.S. currency Seized on December 9, 2015, from Farm Cash Management Money Market Account #XXXXX6300, held at AgriBank, in the Name of Earl Planck, Jr; and

C) $86,510.62 representing twelve (12) checks drawn on account #XXX5443 in the name of Farmers Warehouse Company of Danville at the Farmers National Bank of Danville and endorsed by Tonya Fryman.

## MONEY JUDGMENT:

A sum equal to the amount of gross proceeds in aggregate **EARL LEE PLANCK, JR., R. CHAD PRICE, and JESSE G. SMITH** obtained as a result of the violations alleged in this Indictment.

6.     If any of the property described above, as a result of any act or omission

of the Defendants:

           a.  cannot be located upon the exercise of due diligence;

           b.  has been transferred or sold to, or deposited with, a third party;

           c.  has been placed beyond the jurisdiction of the court;

           d.  has been substantially diminished in value; or

           e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

By virtue of the commission of the felony offenses charged in this Indictment, any

and all interest **EARL LEE PLANCK, JR., R. CHAD PRICE, and JESSE G. SMITH**

have in the above-described property is vested in the United States and hereby forfeited

to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982(a)(1) and

28 U.S.C. § 2461.

A TRUE BILL

FOREPERSON

**ROBERT M. DUNCAN, JR.**
**UNITED STATES ATTORNEY**

33

## PENALTIES

**COUNTS 1-3:**   Imprisonment for not more than 5 years, fine of $250,000 or twice value of loss, and supervised release for 3 years.

**COUNTS 4-20:**   Imprisonment for not more than 30 years, $1,000,000 fine, and supervised release for 3 years.

**COUNT 21:**   Imprisonment for not more than 20 years, $250,000 fine, and supervised release for 3 years

**COUNT 22:**   Imprisonment for not more than 20 years, $500,000 fine or twice the value of the property involved in the transaction, and supervised release for 3 years

**COUNTS 23-28:**   Imprisonment for not more than 5 years, fine of $100,000, and supervised release for 3 years.

**PLUS:**   Mandatory special assessment of $100 per count.

**PLUS:**   Restitution.

**PLUS:**   Forfeiture as listed.